

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

October 9, 1959

Honorable Robert S. Calvert     Opinion No. WW-711
Comptroller of Public Accounts
Capitol Station            Re:   Amount of sales tax due
Austin, Texas                    on the lease and sub-
                                     sequent sale of a motor
Dear Mr. Calvert:            vehicle.

      In your letter of June 3, 1959, you request an opinion of this office on the above question. You outline the situation prompting this inquiry as follows:

> "It is our understanding that Ben Griffin Leasing Company purchases motor vehicles which they register in their name and pay sales taxes thereon. The Company then leases the motor vehicles to individuals or companies for a certain consideration then at the end of the lease contract, the motor vehicle is often sold to the Lessee."

      You then cite a particular instance of this arrangement, in which the Leasing Company (which we may call Lessor) on May 27, 1957, leased to Customer (or Lessee) a 1957 Cadillac. The agreement provided that Customer would pay Lessor a total of $250 per month, each payment comprising a lease charge of $38 and a Depreciation Reserve of $212. The lease could be terminated by either party at the end of any six-month period, by giving thirty days' notice. Other than this, there is no specific duration period; however, it is specified on page 1 that the 1st and 24th monthly payments were due at the time of delivery of the vehicle, and the agreement was actually in effect for twenty-four months, terminating on May 27, 1959. At that time, an invoice was prepared as follows:

> "Final Settlement on Cost Service Lease Agreement #217 on 1957 Cadillac Sedan DeVille Mtr #5762 089296 at expiration of Lease Agreement, May 27, 1959

| "Original Value (Schedule A) | $ 6,155.00 |
|---|---|
| Less Depreciation Reserve Paid (24 payments @ $212.00) | 5,088.00 |
| Book Value as of May 27, 1959 | $ 1,067.00 |

| | |
|---|---:|
| "Purchased by Customer, under terms of Lease Agreement | $ 1,067.00 |
| State Tax, Title and License Transfer | 37.20 |
| Total Amount Due Ben Griffin Leasing Co... | $ 1,104.20 " |

This sale was pursuant to paragraphs 5 and 6 of the Agreement, reading as follows:

"5.   Lessor will sell each automobile as soon as possible after the expiration of this agreement or any extension thereof with respect to such automobile and determine the rebate or deficiency hereinafter provided which shall be paid by the responsible party within thirty days after the date of the sale. . . .It is agreed that the disposition of the used or replaced automobiles is a part of the service to be rendered by the Lessor.  However, Customer shall have the option to sell or dispose of such used or replaced automobiles if he so elects.  If sold by Lessor, Lessor will use its best efforts to obtain full market price for the automobile.

"6.   Lessor agrees to set up to the credit of each automobile the reserve as set forth in paragraph 2.   The total reserve thus accumulated from monthly payments on the automobile by Customer shall be deducted from the original cost of the automobile when leased and the balance shall be the book value of the automobile.   If the sale price of the automobile exceeds such book value Lessor shall refund the difference to Customer. If the sale price is less than such book value. Customer shall pay the difference to Lessor."

A letter to our office from the Ben Griffin Fleet Leasing Co., dated August 6, 1959, in response to our inquiry, contains the following information:

"The balance due by the customer at the end of the Lease, as shown on our invoice, was $1067.00.  We charged the customer $37.20 for State Tax, Title and License Transfer, based on a valuation of the 1957 Cadillac of $3,300.00. We established this valuation by the N. A. D. A. Official Used Car Guide."

Subsequently, on August 11, 1959, you wrote us a supplemental letter, referring to your original request and proceeding in part as follows:

"After submitting the question, we received the enclosed Equipment Lease Agreement between the Dalworth Leasing Company and the Texas Industries, Inc.  As explained in a letter Reed Stewart, Tax Assessor-Collector, Tarrant County, wrote to us on July 6, 1959, a copy of which is enclosed, he has been asked to accept Seller's and Purchaser's Affidavits on four motor vehicles showing that they were being sold by the Dalworth Leasing Company to Texas Industries, Inc., for a consideration of $1.00 on each motor vehicle.

"The Dallas County Tax Assessor-Collector's Motor Vehicle Sales and Use Tax Report for the month of January 1959, shows the Dalworth Leasing Company purchased the four motor vehicles from Southwestern Financial Corporation and paid sales taxes thereon, for which he issued the following receipts:

"430052V - $3.08
430055V -  9.88
430056  -  9.88
430057  -  9.88

"In writing your Opinion, also advise whether the Seller's and Purchaser's Joint Affidavits covering the Sales from Dalworth Leasing Company to Texas Industries, Inc. should show the actual value of each motor vehicle at the time of the sale or the $1.00 as referred to in the letter we received from Mr. Stewart."

The Dalworth Leasing agreement, some seven pages in length, provides in substance that lessee will pay to lessor rental charges specified in separate schedules.  (These schedules were not submitted by the lessor.)  The lease term was 72 months, unless sooner terminated under other provisions.  Paragraph (9) provides as follows:

"(9) DISPOSITION OF EQUIPMENT UPON TERMIN-ATION:  Upon the termination of this Agreement, LESSEE shall have the right in its sole discretion:

"(a) to purchase all or any part
of the LEASED EQUIPMENT leased here-
under at the net cost thereof to the
LESSOR, as specified in Schedule A,
A-1, etc., less amortization charges
set forth in Schedule B of this Agree-
ment; or

"(b) to continue this Agreement in
effect as to all or any part of the
LEASED EQUIPMENT until such time as
such equipment has been fully amor-
tized on the books of LESSOR in accor-
dance with the amortization rates pro-
vided in Schedule B, at which time the
LESSEE shall have the right to pur-
chase such equipment for the sum of
One Dollar ($1.00); or

"(c) surrender all of any part of
the LEASED EQUIPMENT, at such place as
may be agreed upon, to LESSOR for sale
as hereinafter provided.

" . . .

"Any LEASED EQUIPMENT which shall, as of the
date of purchase by LESSEE, have been fully
amortized on the books of LESSOR, in accordance
with the amortization rates provided in Schedule
B shall be valued at the sum of One Dollar ($1.00)
for the purpose of such purchase by the LESSEE."

Paragraph 9 further provides that, if the net proceeds
from sale are less than Lessor's net cost less amortization,
Lessee shall reimburse Lessor for any deficiency. If the pro-
ceeds exceed such adjusted net, Lessee, if not in default,
should receive such excess. Lessee is obligated to purchase
any returned leased equipment not sold within thirty days.

Article 7047(k), Vernon's Civil Statutes, at the
time in question, levied a motor vehicle retail sales tax of
1.1% "of the total consideration paid or to be paid to the
seller by the buyer. . . .whether such consideration be in the
nature of cash, credit, or exchange of other property, or a
combination of these." (Section 1 (a).) Your inquiries re-
solve themselves into a question of what the term "total con-
sideration" would encompass, when these leased vehicles are
ultimately sold to the lessee.

To answer your question, it is first necessary to determine the nature of the two transactions; that is, whether they are actual leases with options to purchase, as they purport to be, or whether they are in reality, conditional sales, disguised as leases.

A conditional sale has been described as a contract for sale of personal property under which possession is delivered to the buyer but title is retained by the seller until the condition (usually payment of the purchase price) is performed. (78 C.J.S., Sales, sec. 553.) Another definition is that a conditional sale is a contract for the bailment or leasing of goods by which the bailee or lessee is obligated to pay a sum substantially equivalent to the value of the goods, the bailee or lessee thereupon becoming, or having the option to become, the owner of the goods upon full compliance with the contract. (Ibid) A lease, on the other hand, as used here, would result in a bailment. 8 C.J.S., Bailments, sec. 2. See Trimount Coin Machine Co. v. Johnson, Sup.Jud.Ct. Me. (1956), 124 A.2d 753.

Classification of certain transactions as conditional sales or as leases with options is often difficult Under the "Pennsylvania Rule", transactions such as here involved (i.e., renting personal property, particularly automobiles, with options to purchase at the end of the term for a nominal consideration) are honored as the leases they purport to be (Jacobson v. Lintz. Sup.Ct.Penn. (1936), 183 A. 63), even though they are admittedly, in substance, conditional sales (G.M.A.C. v. Horton, C.C.A., Third Circuit (1936), 85 F.2d 452). However, this rule seems to be, as described by one court, "an anomaly in the law". (In re Rainey, Dist.Ct. Maryland, (1929), 31 F.2d 197) The majority view is to look through form to the substance of the contract and the underlying intent of the parties. See 8 C.J.S., Bailments, secs. 3 (b), (c), (d); 37A Tex.Jur., Sales, sec. 60; 6 Am.Jur., Bailments, secs. 28, 29, 35 and 38; 47 Am.Jur., Sales, sec. 836.

We quote from a casenote in 7 T.L.R. 329:

"The important problem of the court in interpreting a contract of this sort is to ascertain the intentions of the parties, not from the name they give to the transaction, but from the provisions of the agreement as a whole. (authority) Only a few courts give weight to the name employed in the contract. (authority). . .Where there is no agreement to take, but the lessee or vendee has an option at

the end of the term to buy and apply the install-
ments on the purchase price, the amount of the
installments is of primary importance.  If the
installments are unreasonable as rent, and at the
end of the term amount to the sale price of the
chattel, the transaction is usually held to be a
sale.  (authorities)  The same result follows if
acceptance of the option requires the added pay-
ment of a nominal sum.  (authorities). . ."

In addition to the authorities above cited, see
annotations in 17 A.L.R. 1434; 43 A.L.R. 1257; 92 A.L.R. 321;
and 175 A.L.R. 1382.

Willys-Overland Co. of California v. Chapman, Tex.
Civ.App. (1918), 206 S.W. 978, (no writ history), is the most
nearly analogous Texas case that we have found.  In that
case, defendant contracted to pay appellant, an out-of-state
corporation, a total consideration of $595.00, payable monthly,
"for the rental hire and use" of an automobile.  Upon full
compliance, defendant lessee could exercise an option to buy
the automobile for a further consideration of $5.  The con-
tract was made and possession delivered in California.  During
the lease period, and in voilation of the contract, defendant
removed the automobile to Texas, and sold it to a bona fide
purchaser.  It was contended that defendant was a mere bailee
under the contract and could thus not pass good title.  In
holding against this contention, the court said (page 981):

"It (the contract) is referred to by appel-
lants as a lease contract and is so designated by
the contract itself.  But while it is in form of
bailment for hire, it provides for and had in
view by its terms a sale of the automobile upon
the conditions stated."

The court further holds that, by virtue of Art. 5654
(now Art. 5489), R.C.S., such conditional sale arrangements
are, in Texas, specifically made chattel mortgages.

The agreements about which you inquire contain ele-
ments common to both leases and conditional sales.  In neither
case is the lessee absolutely obligated to keep and pay for
the vehicles.  Each has the option of terminating the lease,
by complying with the applicable provisions, and returning the
vehicle to the lessors for sale.  However, in a true lease,
the rights and obligations of the parties would normally ter-
minate coincidentally with the agreement.  Here, there is a
further contingent liability:  if the sale price received by
the lessor for the returned vehicle is less than lessor's

"book value"  (Griffin) or "unamortized cost" (Dalworth) of the unit, then lessee must pay him the difference, thus indemnifying lessor against any loss upon final disposition.  If this sale price exceeds lessor's interest, lessee receives such excess.  Also, the total amounts payable under the agreements, when lessee's option to purchase is exercised, will equal the actual value of the vehicles, just as if the transactions had been open conditional sales or chattel mortgages. The final consideration is purely nominal in the Dalworth agreement, and substantively so in the Griffin agreement, since in the latter it is less than one-third the then actual value of the vehicle.  Finally, during the lease period, virtually every responsibility and incident of ownership, or conditional ownership, is placed upon lessee.  It is his duty under each contract for example to license the vehicles, to pay costs of maintenance, and to arrange insurance coverage.

In light of the cited authorities, and considering the import and actual results of the agreements, we believe the conclusion is inescapable that the parties contemplated the ultimate sale of the vehicles, in which the agreements culminated, as the heart of the transactions.  It is unnecessary to decide whether they are simple conditional sales or are, by virtue of Art. 5489, chattel mortgages.  In either event, the "total consideration" to be used as a basis for the sales tax should include the total amounts paid by lessee under each agreement.  The Seller's and Purchaser's Joint Affidavits should reflect this total amount paid in each case as "total consideration."

## SUMMARY

Where motor vehicles are transferred under so-called lease agreements, and are later sold to lessees thereunder for nominal considerations, the transactions constitute conditional sales or chattel mortgages.  The Vehicle Sales Tax on "total consideration" paid in exchange for vehicles should be calculated on the total amounts paid lessor by lessee under such agreements, and these should be the amounts reflected in the Seller's and Purchaser's Joint Affidavits.

Yours very truly,

WILL WILSON
Attorney General..

By James R. Irion
Assistant

JRI:bct

APPROVED:

OPINION COMMITTEE:
Geo. P. Blackburn, Chairman

Robert T. Lewis
J. Arthur Sandlin
Bob E. Shannon

REVIEWED FOR THE ATTORNEY GENERAL

By:  W. V. Geppert